# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOSE LUERA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 13-cv-02041 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| SALVADOR A. GODINEZ, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jose Luera, a prisoner in the custody of the Illinois Department of Corrections ("IDOC"), alleges that prison officials failed to prevent him from being transferred to the Menard Correctional Center ("Menard"), where he had "known enemies." Luera claims that after being transferred to Menard he was placed into a cell with a mentally ill prisoner who violently beat him, resulting in substantial physical and mental injuries. He seeks damages and injunctive relief pursuant to 42 U.S.C. § 1983 for the alleged violation of his rights under the Eighth Amendment to the United States Constitution, and he also asserts state law claims for breach of statutory duty and common law negligence. Defendants Salvador Godinez and Tracey Engelson have filed a motion to dismiss Engelson from the case and to transfer the case to the Southern District of Illinois. (Dkt. No. 37.) For the reasons stated below, Defendants' motion to transfer venue to the Southern District of Illinois is granted. The motion to dismiss Engelson is denied without prejudice so that the issue may be decided by a court in the proper venue.

**BACKGROUND**

The following facts are taken from the First Amended Complaint. (Dkt. No. 32.) On September 9, 2011, Luera was processed into the Northern Reception Center ("NRC").[1] (*Id.* ¶ 10.) During the intake process, Luera was not asked any questions about whether he had known enemies in the IDOC. He later learned that he should have been asked about his known enemies and wrote a letter to the superintendent of the NRC, Defendant Engelson, explaining that he had enemies at Menard and that if he was transferred there his life would be in danger. (*Id.* ¶¶ 14-15.) Engelson forwarded the letter to Defendant Thompson, who then came to re-interview Luera. (*Id.* ¶ 15.) Luera alleges that he gave Thompson a list of his known enemies at Menard and that Thompson personally assured him that he would not be sent there. (*Id.* ¶ 16.)

On September 29, 20111, however, Luera was transferred to Menard. (*Id.* ¶ 17.) Luera claims that he saw Thompson while he was waiting to be transferred and expressed his concerns about Menard again, but she ignored him. (*Id.* ¶ 18.) At Menard, Luera was placed in West House with inmate William Thompson. (*Id.* ¶ 19.) William Thompson had just completed time in segregation at the Pontiac Correctional Center for assaulting another inmate. (*Id.*) Luera feared for his life, and "was also afraid that his enemies would turn his cellmate against him, which is a common practice in the I.D.O.C." (*Id.* ¶ 20.)

While he was housed with William Thompson, Luera noticed hyperactive, erratic, and aggressive behavior from him, and also observed that he was not taking his prescribed psychotropic medication or keeping his appointments with the prison psychiatrist. (*Id.* ¶ 21.) Luera informed Defendants Lyerla and Birk that he feared for his safety due to these issues with William Thompson, and again stated that he had enemies at Menard and feared for his life. (*Id.*

---

[1] Luera states that the NRC is part of Stateville. Defendants respond that while NRC is located "near Stateville," they are two separate buildings and "[i]nmates from one building do not mix with inmates from the other." (Def.'s Mot. to Dismiss at 2, Dkt. No. 37.)

¶¶ 22-23.) He expressed these concerns to Lyerla and Birk several times, and also requested that they place him in protective custody, which they did not do. (*Id.* ¶¶ 24-25.)

On October 23, 2011, around 7:30 a.m., Luera was violently attacked by his cellmate while he was sleeping. William Thompson bludgeoned Luera with his television and then pulled Luera off of the top bunk and violently beat him. (*Id.* ¶ 26.) Luera alleges that other prisoners heard the beating taking place and screamed for the gallery officer. (*Id.* ¶ 27.) William Thompson wrapped Luera in a blanket towards the front of the cell, where he lay in a pool of blood, comatose, until he was found at 9:30 a.m. when the gallery was being released for lunch. (*Id.* ¶¶ 28-29.) Luera suffered a stroke as a result of the attack and medical personnel told him that, on a scale of one to ten, he had a negative one chance of living because of the delay in treatment. (*Id.* ¶¶ 29-30.) He suffered "massive head injuries, a right orbital wall fracture, a right maxillary sinus fracture, a left nasal bone fracture, and multiple facial lacerations." (*Id.* ¶ 31.)

Luera alleges that Defendants Engelson and Thompson failed to protect him by permitting him to be transferred to Menard even though he had known enemies at the facility. He also alleges that Defendants Lyerla and Birk were repeatedly informed about the issues with his cellmate, yet failed to protect him from being attacked. Luera claims that a few days prior to the assault, he was supposed to be moved to East House, but then Lyerla informed him "that his move was cancelled for reasons unknown to him" and he was placed back in his cell with William Thompson. (*Id.* ¶¶ 44-45.) He also alleges that IDOC personnel and medical staff were indifferent to his serious medical needs and that he has made frequent complaints since the assault about, "amongst other things, headaches, nausea, disorientation, pain, urinary and digestive dysfunction, imbalance, difficulty walking, and right-sided numbness and muscle dysfunction." (*Id.* ¶ 54.) He claims that his complaints were ignored, that he was not prescribed necessary medications, that appropriate

medical tests were delayed or canceled, and that he was denied needed physical therapy. (*Id.* ¶ 55.)

Luera did not file a grievance until June 4, 2012, at which point it was found to be untimely by prison officials. (*Id.* ¶ 59, Ex. B.) He states that he was unable to file a grievance while he was in the hospital because he was suffering from "ongoing migraine headaches, memory loss, lack of appetite, lack of taste, cold sweats, dizziness, blurred vision, emotional distress, involuntary muscle contractions, and loss of motor skills" which, at times, affected his ability to write. (*Id.* ¶ 57.)

With this lawsuit, Luera seeks a declaratory judgment that the policy of housing non-mentally ill prisoners with mentally ill prisoners as well as the specific conduct by Defendants toward Luera violate the Eighth Amendment and also constitute a breach of statutory duty by Defendants. He asks the Court to issue an injunction requiring Defendant Godinez or his agents to (1) stop housing non-mentally ill persons with mentally ill persons immediately, (2) create a policy requiring mentally ill persons who fail to keep their mental health appointments to be put under immediate observation, (3) immediately arrange for him to be given a CT scan and any other needed medical treatment, and (4) immediately arrange for him to see a neurologist to assess needed medical treatment. He is also seeking compensatory and punitive monetary damages against each Defendant.

## DISCUSSION

### I. Motion to Transfer Venue

Defendants seek to transfer this case to the Southern District of Illinois. Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

To prevail, the moving party must show the following: "(1) venue is proper in this district; (2) venue and jurisdiction are proper in the transferee district; (3) the transferee district is more convenient for both the parties and witnesses; and (4) transfer would serve the interests of justice." *Annett Holdings v. Certain Underwriters at Lloyds*, No. 08-cv-1106, 2008 WL 2415299, at *2 (N.D. Ill. June 12, 2008). In ruling on a motion under § 1404, the Court considers the relevant factors "in light of all the circumstances of the case," an analysis that "necessarily involves a large degree of subtlety and latitude," including the relative weight to give to each of the factors. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 (7th Cir. 1986).

The parties do not dispute that venue is appropriate in both the Northern District of Illinois and the Southern District of Illinois. For a federal civil action, venue is proper in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b). Here, Luera has named as Defendants two individuals that work at the NRC or Stateville, as well as unnamed John Doe Defendants from Stateville, all of whom are located in the Northern District. He has also alleged conduct at both the NRC and Stateville. So venue is proper in the Northern District. However, other Defendants named in this lawsuit reside in the Southern District and, as will be discussed in greater detail below, a substantial portion of the relevant events took place there. Thus, the Southern District is also an appropriate venue.

In the Seventh Circuit, the party moving for a transfer of venue "has the burden of establishing, by reference to particular circumstances, that the transferee forum is clearly more convenient." *See Coffey*, 796 F.2d at 219-220. To evaluate the convenience of one venue over another, courts consider "the availability of and access to witnesses, and each party's access to

5

and distance from resources in each forum," as well as "the location of material events and the relative ease of access to sources of proof." *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010). To evaluate the interest of justice, "courts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums, each court's relative familiarity with the relevant law, the respective desirability of resolving controversies in each locale, and the relationship of each community to the controversy." *Id*. The Seventh Circuit has stated that the interest of justice may be "determinative" and result in the grant or denial of a motion for transfer even if the convenience factors point in the opposite direction. *Id.* The Court "must also give some weight to the plaintiff['s] choice of forum." *Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Texas*, 134 S. Ct. 568, 581 n.6 (2013). But deference to the plaintiff's choice of forum diminishes in significance where the forum "bears little connection to the litigation." *Poole v. Saddler*, No. 13-cv-4984, 2014 WL 585306, at *6 (N.D. Ill. Feb. 14, 2014).

Here, Luera has chosen the Northern District of Illinois as his forum. The weight that the Court must give to that choice depends on whether this forum has a sufficient connection to the litigation. Luera alleges that individuals at the NRC failed to prevent his transfer to Menard, that he was severely beaten while at Menard, and that while at Menard and Stateville, he failed to receive adequate medical care to address the ongoing issues presented by his injuries.[2] While Luera alleges that the refusal by individuals at the NRC to prevent his transfer in light of his known enemies at Menard caused his injuries, he will need to prove that claim through evidence that the attack by his cellmate was somehow instigated by one of his known enemies. The primary evidence in this case will revolve around the conduct of any known enemies that Luera had at

---

[2] While Defendants claim that Luera has not named a single medical care provider, Luera, in his First Amended Complaint, refers explicitly to medical personnel ignoring his complaints and failing to provide adequate medical care and lists "John Does 1-99" as Defendants.

Menard, the conduct of his cellmate at Menard, the failure to provide immediate medical attention at Menard, and the subsequent harm to Luera while he was at Menard. While some of the material events are alleged to have taken place in the Northern District, the bulk of what Luera will have to prove for the events in the Northern District even to be relevant occurred in the Southern District. The Court therefore finds that the situs of material events favors transfer to the Southern District.

The Court next considers the convenience of witnesses, which "is often viewed as the most important factor in the transfer analysis." *JDA eHealth Sys., Inc. v. Chapin Revenue Cycle Mgmt., LLC*, No. 07 C 7781, 2011 WL 2518938, at *4 (N.D. Ill. June 23, 2011) (quoting *Preussag Int'l Steel Corp. v. Ideal Steel & Builder's Supplies, Inc.*, No. 03 C 6643, 2004 WL 783102, at *5 (N.D. Ill. Jan. 20, 2004)). Although Luera does identify family members and a medical expert located in the Northern District, these are the types of witnesses who have limited personal knowledge of the events at issue and who would appear voluntarily for trial. Presumably, Luera will look for witnesses at the NRC, Menard, and Stateville to testify about what actually happened, and Defendants may do the same. Given that most of the key events took place at Menard, it is likely that the largest number of non-party, non-voluntary witnesses would come from Menard, whether in the form of inmates, others to whom Luera complained, his "known enemies," or medical personnel from the ambulance or the hospital where he was treated after he was found injured in his cell. Thus, the convenience of witnesses clearly favors the Southern District.

As for the convenience of the parties, the Court notes that Luera is currently located at Stateville in the Northern District, and therefore a transfer to the Southern District would certainly be less convenient for him. Given that Defendants have the burden of showing that "the original forum is inconvenient for the defendant and that the alternative forum does not significantly

7

inconvenience the plaintiff," *Cont'l Cas. Co. v. Staffing Concepts, Inc.*, No. 06 C 5473, 2009 WL 3055374, at *5 (N.D. Ill. Sep. 18, 2009), this factor weighs against transfer.

Luera further argues that a transfer would inconvenience his recruited counsel and may result in withdrawal of their representation, leaving him without counsel to represent him in the Southern District. While it is true that Luera has received the benefit of recruited counsel in the Northern District, convenience of counsel is not a factor to be considered in a §1404(a) analysis. *See Body Sci. LLC v. Boston Scientific Corp.*, 846 F. Supp. 2d 980, 993 (N.D. Ill. 2012) ("It is well-settled, however, that consideration of the convenience of Plaintiff's counsel is not an appropriate factor to consider when evaluating transfer.") (citing *Chicago, R.I. & P.R. Co. v. Igoe*, 220 F.2d 299, 304 (7th Cir. 1955) ("[N]or does § 1404(a) provide that the convenience of counsel is a factor to be considered.")); *Von Holdt v. Husky Injection Molding Sys., Ltd.*, 887 F. Supp. 185, 190 (N.D. Ill. 1995) ("[T]he convenience to a plaintiff's counsel is not a proper consideration."). That Luera has had the benefit of recruited counsel in this matter since August 2013 does not speak to whether venue is more appropriate in the Northern District or the Southern District. Otherwise, all indigent plaintiffs would argue that their cases should remain in the Northern District simply because the Northern District has greater access to recruited counsel, regardless of the underlying merits of the venue analysis. Additionally, counsel for Defendants is also based in Chicago, meaning that both parties would have to travel to the Southern District if the motion is granted. *See Boyd v. Snyder*, 44 F. Supp. 2d 966, 972 (N.D. Ill. 1999) (granting motion to transfer to the Southern District even though plaintiffs were represented by non-profit, public interest lawyers that would be burdened by the transfer, because both parties would have to travel to the Southern District and such travel was already a necessary part of the case).

The next factor the Court considers—the location of documents—generally has little impact on the § 1404(a) analysis because technology has made the transfer of documents across even great distances relatively easy. *See Rabbit Tanaka Corp. USA v. Paradies Shops, Inc.*, 598 F. Supp. 2d 836, 840 (N.D. Ill. 2009) ("In this day and age, transferring documents from one district to another is commonplace and, given the widespread use of digital imaging in big-case litigation, no more costly than transferring them across town."); *Annett Holdings v. Certain Underwriters at Lloyds*, No. 08-cv-1106, 2008 WL 2415299, at *4 (N.D. Ill. June 12, 2008) ("Furthermore, defendants have not shown that any documents located in Washington could not be easily transported to Illinois."). Still, to the extent it is a factor, the location of documents favors transfer. The majority of the documents in this case will relate to conduct that took place at Menard and are likely to be located there.

The Court next evaluates the interest of justice by looking at docket congestion, speed to trial, familiarity with the law, the desirability of resolving controversies in each locale, and the relationship of each community to the controversy. As of June 30, 2014, the median time from filing to trial in the Northern District was 35.4 months, while the median time from filing to trial in the Southern District was 34.4 months. *See* Statistics/FederalCourtManagementStatistics/2014/comparison-districts-within-circuit-june-2014.pdf&page=7 (last viewed March 30, 2015). On the other hand, the median time from filing to disposition in civil cases was 6.9 months in the Northern District and 27.9 months in the Southern District. *Id.* The Court therefore finds that the docket congestion analysis, if anything, leans somewhat in favor of the Northern District. *See Marshall v. Wexford Health Sources, Inc.*, No. 13 C 8678, 2014 WL 2536246, at *5 (N.D. Ill. June 5, 2014) ("While these figures suggest that the Southern District has a higher prospect for an earlier trial, the interest in a speedy disposition overall may favor the Northern District.").

Both the Southern District and the Northern District are equally familiar with the underlying law in § 1983 cases brought by prisoners, so this factor does not cut either way with respect to transfer. As for the desirability of resolving controversies in their respective locales and the relationship of each community to the controversy, the Court finds that the central events alleged to have taken place in this matter happened in the Southern District at Menard. While Luera has alleged improper conduct at the NRC and Stateville as well, that conduct is peripheral to the main allegations of what happened at Menard: Luera's known enemies persuading his cellmate to attack him, the officers' failure to protect him at Menard, and the failure adequately to treat him immediately after the attack. Thus, this factor weighs in favor of transfer.

This case bears substantial similarity to another Northern District case, *Marshall v. Wexford Health Sources, Inc.*, in which the plaintiff alleged that he was initially housed at Stateville and made complaints there about a toothache and infection, and then was subsequently transferred to Pickneyville Correctional Center, where he continued to complain about these problems and then fell into a coma. 2014 WL 2536246, at * 1. The plaintiff was transferred to the Memorial Hospital of Carbondale for immediate treatment and then transferred to Kindred Hospital in Chicago for additional treatment. *Id.* He filed a case in the Northern District, where he then resided, and the defendants sought to transfer the case to the Southern District, alleging that the majority of the events took place there. The court noted that, "[w]hile the Northern District has an interest in litigating disputes that involve alleged misconduct at correctional facilities within its jurisdiction, the central events that gave rise to Marshall's claim arose in the Southern District," and ultimately found that the convenience of non-party witnesses and the interest of justice supported a transfer even though the plaintiff resided in the Northern District. *Id.* at *5-6. The Court finds the reasoning of that decision persuasive here, as Luera must procure evidence

from the Southern District to support his claims in the Northern District, which are peripheral to the attack that took place at Menard.

In sum, while a transfer to the Southern District would be less convenient for Luera given that he no longer resides there, the material events of this case took place in the Southern District, the majority of non-voluntary non-party witnesses will likely reside in the Southern District, and the Southern District has an inherent interest in resolving the main controversy. The Court therefore finds that, on balance, the § 1404(a) factors clearly weigh in favor of transfer.

**II.    Motion to Dismiss**

Because the Court finds transfer to the Southern District to be appropriate in this case, the Court declines to rule on the pending motion to dismiss so that the issue may be decided by a court in the appropriate venue. Accordingly, that motion is denied without prejudice.

**CONCLUSION**

For the reasons stated above, Defendants' motion to transfer venue is granted. This case shall be transferred to the Southern District of Illinois for all remaining proceedings. The motion to dismiss is denied without prejudice.

ENTERED:

Dated: March 30, 2015

Andrea R. Wood
United States District Judge